## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## LAREDO DIVISION

| | |
|---|---|
| Paul Parrott, as the representative of a class of similarly situated persons, and on behalf of the International Bancshares Corporation Employees' Profit Sharing Plan and Trust,<br><br>Plaintiff,<br><br>v.<br><br>International Bank of Commerce, International Bancshares Corporation, and the International Bancshares Corporation Profit Sharing Plan Committee,<br><br>Defendants. | Case No. _____<br><br><br><br><br>**CLASS ACTION COMPLAINT** |

## NATURE OF THE ACTION

1.       Plaintiff Paul Parrott ("Plaintiff"), as the representative of the Class described herein, and on behalf of the International Bancshares Corporation Employees' Profit Sharing Plan and Trust (the "Plan"), brings this action pursuant to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against Defendants International Bank of Commerce ("IBC"), International Bancshares Corporation ("IBC Holdco"), and the International Bancshares Corporation Profit Sharing Plan Committee (the "PSP Committee") (collectively, "Defendants"). This case is about Defendants' failure to invest Plan assets prudently and for the exclusive benefit of Plan participants. Defendants treat Plan assets like company assets—including by depositing Plan assets with the company in low-yield, no-growth accounts—to the detriment of participants' retirement savings. The foregoing violated Defendants' fiduciary duties under ERISA, 29 U.S.C. §§ 1104(a)(1) and 1106(a)–(b).

## PARTIES

### *The Plan*

2.       The Plan is a tax-deferred retirement savings plan for purposes of the Internal Revenue Code, 26 U.S.C. § 401(k).

3.       The Plan is a "defined contribution plan" as defined by ERISA, 29 U.S.C. § 1002(34) (also known as a "DC plan" or "individual account plan").

4.       The Plan is sponsored by IBC Holdco for the benefit of IBC employees and employees of other IBC Holdco subsidiaries (collectively with IBC, "IBC Banks").

5.       As a defined contribution plan, the Plan maintains an individual account for each participant. Each participant's account is credited with (1) their elective contributions, (2) their *pro rata* share of contributions from IBC Holdco, and (3) their *pro rata* share of the Plan's investment income and gains.

6.    Participants do not direct Plan investments. Participants rely solely on Defendants to invest Plan assets for the purpose of providing retirement benefits. In this regard, the Plan is not typical. Most defined contribution plans allow each participant to choose their own investments from a menu of funds managed by professional asset managers.

7.    Plan benefits are limited to the value of participants' individual accounts. Each participant's benefit is equal to the value of their individual account at the time that it is distributed.

8.    The Plan has around $100 million in assets and around 1,500 participants.

### Plaintiff Paul Parrott

9.    Plaintiff is a natural person and a resident of Garden City, Kansas. He is a former participant in the Plan. He worked for an IBC Bank between 2018 and 2021. At all times during his participation in the Plan, he did not expect to retire for more than 10 years (and indeed, he is still working). He does not have sufficient assets set aside to support himself in retirement.

10.    Plaintiff's distribution from the Plan was determined by the sum of contributions and Plan investment income and gains allocated to his individual account. His distribution would have been greater had Defendants invested his account according to a prudent and loyal process.

### Defendants

11.    Defendant IBC is a state-chartered bank based in Laredo, Texas. IBC is the largest bank subsidiary of IBC Holdco.

12.    According to Consolidated Reports of Condition and Income that IBC filed with bank regulators, IBC manages the Plan's investments in a fiduciary capacity with discretion to buy and sell investment assets on behalf of the Plan. Accordingly, IBC is a "fiduciary" of the Plan as defined by 29 U.S.C. § 1002(21)(A)(i).

13.     IBC is also a "party in interest" to the Plan as defined by 29 U.S.C. § 1002(14)(A)–(C) because (1) it is a Plan fiduciary, (2) it provides services to the Plan, and (3) its employees are participants in the Plan.

14.     Defendant IBC Holdco is a bank holding company organized in Texas. IBC Holdco wholly owns and operates five banks—the IBC Banks—in Texas and Oklahoma.

15.     According to SEC filings, IBC Holdco monitors IBC with respect to the Plan by reviewing Plan investments quarterly through its Trust Committee. In this capacity, IBC Holdco has authority to control how IBC exercises its discretion with respect to Plan investments. Accordingly, IBC Holdco is a "fiduciary" of the Plan as defined by 29 U.S.C. § 1002(21)(A)(i), (iii).

16.     IBC Holdco is also a "party in interest" to the Plan as defined by 29 U.S.C. § 1002(14)(A), (E) because it is a Plan fiduciary and the parent company of the Plan employer.

17.     Defendant PSP Committee is a standing committee of the Board of Directors of IBC Holdco. The PSP Committee has broad authority to administer the Plan. The PSP Committee monitors IBC and IBC Holdco with respect to the Plan and has authority to appoint new individuals, committees, or companies to manage Plan investments. Accordingly, the PSP Committee is a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A)(i), (iii).

## JURISDICTION AND VENUE

18.     Plaintiff brings this action pursuant to 29 U.S.C. §§ 1132(a)(2) and (3), which provide that a participant in an employee benefit plan may pursue a civil action on behalf of the plan to remedy violations of ERISA and obtain monetary and appropriate equitable relief.

19.     This case presents a federal question under ERISA and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

20.     Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because Defendants' violations of ERISA occurred in this district, where IBC and IBC Holdco are headquartered and where the Plan is administered.

## DEFENDANTS' IMPRUDENT AND SELF-SERVING INVESTMENT PROCESS

### *The Prudent Investor Rule*

21.     ERISA fiduciaries must follow the "prudent investor rule" adopted from the law of trusts. *See Buccino v. Cont'l Assur. Co.*, 578 F. Supp. 1518, 1521 (S.D.N.Y. 1983) (the "common law prudent investor' rule [was] codified by ERISA.").

22.     The prudent investor rule is based on modern portfolio theory. *See Laborers Nat. Pension Fund v. N. Tr. Quantitative Advisors, Inc.*, 173 F.3d 313, 322 (5th Cir. 1999) ("Since 1979, investment managers [of ERISA plans] have been held to the standard of prudence of the modern portfolio theory by the Secretary's regulations."); *see also* Restatement (Third) of Trusts (2007) (hereinafter "3d Rest.") § 90 intr. note ("[T]he prudent investor rule of this Restatement seeks to modernize trust investment law.").

23.     Pursuant to the prudent investor rule, fiduciaries must invest plan assets in a manner that is "reasonably designed to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain." 29 C.F.R. § 2550.404a-1(b)(2)(i); *see also* 3d Rest. § 90(a) (fiduciaries must pursue "an overall investment strategy[] which … incorporate[s] risk and return objectives reasonably suitable to the trust.").

24.     The prudent investor rule departs from earlier understandings of prudence that overemphasized risk avoidance. *See* 3d Rest. § 90 cmts. a & k ("the prudent investor rule is "an extension and clarification of the traditional … 'prudent man rule,'" pursuant to which "[b]road categories of properties and techniques came to be … classified as 'impermissible'"); *see also*

*id.*, Reporter's Note to cmt. e. ("'safety' of the funds invested was often identified as 'the primary object to be obtained by a trustee' under traditional doctrine").

25.    Rather than avoid risk, fiduciaries must *manage* risk in pursuit of the objectives of the plan. *See* Max M. Schanzenbach & Robert H. Sitkoff, *The Prudent Investor Rule and Market Risk: An Empirical Analysis*, 14 J. EMPIRICAL LEGAL STUD. 129, 130 (Mar. 2017) (hereinafter "Schanzenbach") ("The prudent investor rule … reorients trust investment from risk avoidance to risk management[.]").[1]

26.    An appropriate investment strategy suited to the objectives of a plan must consider the time horizons and needs of beneficial investors. *See* 29 C.F.R. § 2550.404a-1(b)(4) ("A fiduciary's determination with respect to an investment" must "us[e] appropriate investment horizons consistent with the plan's investment objectives."); *see also* 3d Rest. § 90 cmt. k ("Asset selection … requires sensitivity to the trust's investment time horizons[.]").

27.    A plan's risk tolerance "largely depends" on how long funds will be held. 3d Rest. § 90 cmt. e(1). The longer funds are expected to be held, the greater the investor's tolerance for short-term risks associate with market volatility. *See* CFA Institute, *Investment Risk Profiling: A Guide for Financial Advisors*, 6-7 (2020) (hereinafter "CFA Inst.") ("All else being equal, investors with long goal time horizons have a greater capacity to withstand and recoup portfolio losses resulting from market volatility, compared with investors with shorter goal time horizons.").[2]

28.    The prudent investor rule prohibits fiduciaries from considering interests other than the interests of beneficiaries. *Id.* cmt. c (stating that the duty of loyalty "prohibit[s] …

---

[1] *Available at* www.aals.org/wp-content/uploads/2018/02/AM17PrudentInvestorRuleandMarketRisk.pdf.
[2] *Available at* https://www.cfainstitute.org/-/media/documents/survey/investment-risk-profiling.ashx.

investing in a manner that is intended to serve interests other than those of the beneficiaries"); 29 U.S.C. § 1104(a)(1)(A) (fiduciaries must act for the "exclusive benefit" of plan participants).

29.     A fiduciary must not "sacrifice investment return" to serve their own interests. *See* 29 C.F.R. § 2550.404a-1(c)(1); *see also Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 298 (5th Cir. 2000).  If there is a conflict between participants' interests and the fiduciary's personal interests, the fiduciary must "take precautions to ensure that their duty of loyalty is not compromised." *Bussian*, 223 F.3d at 299. In some cases, "the only open course of action may be to appoint an independent fiduciary." *Id.*

30.     While "there are endless variations in reasonable strategies for investing," a fiduciary's investment approach "must be reasonably supported in concept and must be implemented with proper care, skill, and caution." *See* 3d Rest. § 90 cmts. f & h.

31.     Whether a fiduciary satisfied its duty is a test of conduct and process. *Id.* cmt. (e)(1) ("The test of prudence is one of conduct, not one of performance."). Courts consider whether fiduciaries "employed the appropriate methods to investigate the merits of the investment." *Donovan v. Mazzola*, 716 F.2d 1226, 1232 (9th Cir. 1983); *see also Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356–58 (4th Cir. 2014) (prudence turns on whether the fiduciary "engaged in a reasoned decision-making process").

### The Plan's Investment Objective and Tolerance for Risk

32.     The Plan is an employee retirement plan.

33.     Employee retirement plans are generally long-term investments. *See* 72 Fed. Reg. 60452, 60463 (finding that retirement investments made on behalf of employees "ought to and often will be long-term investments").

34.     The average U.S. worker at any given time is around 20 years or more from retirement age. *See* U.S. Bureau of Labor Statistics, "Employment Projections: Median age of the labor force, by sex, race and ethnicity."[3]

35.     The average U.S. worker is unprepared for retirement. *See* Statement of Dan Doonan, Executive Director, National Institute on Retirement Security, to the Senate Committee on Health, Education, Labor, and Pensions, 118th Cong. (2024), 3 (Feb. 28, 2024) ("The data indicate that most Americans, particularly middle-class workers, are falling far short when it comes to saving enough money for a financially secure retirement.").[4] The shift from defined benefit to defined contribution plans like the Plan has left a substantial retirement readiness deficit in the U.S. *See id.* at 5.

36.     The Plan and its participants have a long investment horizon, consistent with the typical employee retirement plan.

37.     The average IBC Banks worker is younger and farther from retirement than the national average worker.

38.     IBC Holdco and IBC Banks do not offer a defined benefit plan or a supplemental defined contribution plan. The Plan is the only retirement benefit offered to IBC Banks employees.

39.     The average Plan balance is less than $70,000. This is insufficient for retirement. *See* PwC, "Retirement in America: Time to rethink and retool," 4 (2021) (finding $120,000 is

---

[3] *Available at* www.bls.gov/emp/tables/median-age-labor-force.htm.
[4] *Available at* https://www.nirsonline.org/wp-content/uploads/2024/02/FINAL-Senate-Written-Testimony-Feb-2024.pdf.

"hardly enough even without factoring in rising life expectancies and increasing healthcare costs.").[5]

40.     Generally, IBC Banks employees work because they need regular income to support themselves and their families. The typical IBC Banks employee does not have generational wealth or other assets set aside sufficient to support themselves in retirement.

41.     Plan participants suffer an extra 10% penalty tax to use their accounts before retirement age, in addition to having the entire withdrawal taxed as income. *See* 26 U.S.C. § 72(t).

42.     Plan participants are further encouraged to hold their Plan accounts until retirement by deferral of tax on account contributions and investment earnings. *See* 26 U.S.C. § 501(a).

43.     IBC Holdco acknowledges that the Plan is intended for long-term retirement investment. The company advises employees: "[L]eave the money in the Plan to grow. Using these funds before retirement should be jealously avoided."[6]

44.     Based on the foregoing, Plan participants have a long investment horizon and need their account values to grow in order to generate sufficient retirement income. This means that Plan participants have a high tolerance for risk associated with market volatility and need a balanced, diversified investment strategy with a primary emphasis on long-term capital appreciation.

---

[5] *Available at* https://www.pwc.com/us/en/industries/asset-wealth-management/assets/pwc-retirement-in-america-rethink-retool.pdf.

[6] That some employees will leave IBC Banks before retirement and withdraw their accounts from the Plan does not change their investment horizon. The Plan must allow workers to transfer their accounts to other tax qualified retirement plans to avoid the penalty tax. *See* 26 U.S.C. §§ 401(a)(31), 402(c). While assets cannot be transferred in kind, participants will generally be able to transfer their assets into another qualified retirement plan and elect investments appropriate for their retirement needs. Distribution from the Plan is not typically the end of a participant's investment horizon.

*Tailoring the Plan's Strategy to the Plan's Objectives*

45.    A prudent fiduciary would apply several guidelines in selecting and monitoring investment assets for the Plan, given the Plan's need for long-term capital appreciation.

46.    First, short-term performance, positive or negative, would not be given substantial weight. Long-term investors can tolerate short-term losses and benefit from short-term gains only if sustained over the long run. *See* CFA Institute 6-7; *see also* 3d Rest. § 90 cmt. l (noting that that the "prospect of long-term appreciation" will "compensat[e]" for risk of short-term loss and is a "proper" focus when making "a deliberate effort to increase the real value of the trust estate").

47.    Second, total return would be the focal point. Total return is the sum of investment income (*e.g.*, interest, dividends, rent) and gains (the increase in the price of the asset owned). Because a retirement investor's objective is to increase their account value between point A (contribution) and point B (retirement), assets likely to have increased in value at point B are generally the best fit. *See* 3d Rest. § 90 cmt. c (seeking current income but not gains over long periods risks leaving insufficient account value to generate future income and is akin to "invading principal"). However, assets that produce current income need not be avoided, as income is tax-free to the Plan until point B and adds to the accumulation of participant account. The focus should be on the sum of both income and gains. *See id.* cmt. i (a "focus on total return" is reasonable if there is no need to account separately for income during the investment horizon).

48.    Third, asset classes would be assigned target allocation ranges, and the fiduciary would generally adhere to those ranges over time. *See* Schanzenbach at 131 (describing "normal" practice to "prescribe a target asset allocation range appropriate to the risk tolerance of the

trust"); Roger G. Ibbotson & Paul D. Kaplan, *Does Asset Allocation Policy Explain 40, 90, or 100 Percent of Performance?*, 56 FIN. ANALYSTS J. 1, 26-33 (hereinafter "Ibbotson") ("[P]lan sponsors select a long-term strategic target and tend to stick to it.").[7] Adhering to defined ranges gives effect to the long-term return assumptions that backed the fiduciary's initial asset selections. The idea that one can maximize long-term returns by serially shifting large portions of the portfolio among asset classes to avoid losses and capture only gains is not supported by evidence. *See* 3d Rest. § 90 gen. note to cmts. e-h ("Empirical research supporting the theory of efficient markets reveals that in such markets skilled professionals have rarely been able to identify underpriced securities (that is, to outguess the market with respect to future return) with any regularity.").[8]

### *Major Asset Classes and their Risk and Return Characteristics*

49.    Among major asset classes, stocks are recognized to provide the highest long-term average returns. *See* 3d Rest. § 90 cmt. l ("Historically, corporate stocks have provided greater total return over the long term[.]").

50.    Money market accounts, interest-bearing bank deposits, certificates of deposit, and short-term treasury bonds generate the lowest long-term average returns among major asset classes. *See id.* ("Returns from these investments have traditionally been relatively low[.]"); Òscar Jordà *et al.*, *The Rate of Return on Everything, 1870-2014*, 134 Q.J. ECON. 1225, 1228–30, 1234, 1241, 1280–81 (2019) (finding that the average return on government bonds and bank deposits was around 6% lower than stocks over more than a century).

---

[7] *Available at* https://www.evidenceinvestor.com/wp-content/uploads/2016/08/Does-Asset-Allocation-Policy-Explain-40-90-100-Percent-of-Performance-Roger-G.-Ibbotson-Paul-D.-Kaplan-Feb-2000.pdf.
[8] This is not to say that asset class performance should not be monitored or that changes should be disallowed. Stating asset allocation targets in ranges provides flexibility to modify the asset mix deemed best suited to the investor's objectives, as long-term assumptions may change. However, larger shifts—especially shifts in response to temporary conditions—are avoided.

51.     Stocks are appropriate for long-term investors who can tolerate short-term volatility. The higher short-term volatility of stocks is compensated through higher long-term returns, which the long-term investor needs. *See* 3d Rest. § 90 cmt. l ("Ordinarily a trustee may … justify the relatively high principal risks associated with stock investments on the basis of a compensating prospect of long-term appreciation in share values.").

52.     In contrast, money market accounts, bank deposits, certificates of deposit, and short-term treasury bonds are used to "mak[e] modest amounts of trust funds productive for limited periods of time." *See id.*

53.     While low-growth assets avoid short-term volatility risk, they introduce heightened risks over the long-term, including loss of purchasing power. *See id.* (fixed-interest investments "expos[e] the principal … to the risk of purchasing power impairment as a result of inflation").

54.     Not only is the asset base at risk by holding low-growth assets for long periods, the future income stream that can be generated from that asset base will also suffer a loss of purchasing power. *See id.* ("in the long run" a purchasing power deficit in fixed-interest investments will apply to "income as well"); *id.* cmt. c ("a low-growth … investment strategy, adhered to over a long period, would pose a risk not only to principal interests but also with respect to a life beneficiary's future [income] security").

55.     Assets such as stocks that generate higher long-term average returns protect against such long-term risks. *See id.* cmt. l ("a primary and proper attraction of common stocks is that they offer trustees a hedge against loss of purchasing power")

56.     Recent 10-year periods are consistent with longer historical trends and assumptions regarding asset class performance. As Illustration A, below, demonstrates, stocks

have generated the highest long-term average returns, and cash equivalents and shorter-term

bonds have generated the lowest long-term average returns.

*Illustration A: Major Asset Classes, 10-Year Average Annual Returns[9]*

| 2018 10-Year Avg. Ann. Return | 2019 10-Year Avg. Ann. Return | 2020 10-Year Avg. Ann. Return | 2021 10-Year Avg. Ann. Return | 2022 10-Year Avg. Ann. Return | 2023 10-Year Avg. Ann. Return |
|---|---|---|---|---|---|
| Mid Cap Stocks | Large Cap Stocks | Large Cap Stocks | Large Cap Stocks | Large Cap Stocks | Large Cap Stocks |
| *13.68%* | *13.56%* | *13.88%* | *16.55%* | *12.56%* | *12.03%* |
| Large Cap Stocks | Mid Cap Stocks | Mid Cap Stocks | Mid Cap Stocks | Mid Cap Stocks | Mid Cap Stocks |
| *13.12%* | *12.72%* | *11.51%* | *14.20%* | *10.78%* | *9.27%* |
| Small Cap Stocks | Small Cap Stocks | Small Cap Stocks | Small Cap Stocks | Small Cap Stocks | Small Cap Stocks |
| *11.97%* | *11.83%* | *11.20%* | *13.23%* | *9.01%* | *7.16%* |
| High Yield Corp Bonds | Long-Term Corp Bonds | Long-Term Corp Bonds | International Stocks | International Stocks | High Yield Corp Bonds |
| *11.12%* | *7.99%* | *8.24%* | *7.84%* | *4.59%* | *4.60%* |
| Long-Term Corp Bonds | High Yield Corp Bonds | Long-Term Treasury Bonds | High Yield Corp Bonds | High Yield Corp Bonds | International Stocks |
| *7.40%* | *7.57%* | *7.80%* | *6.83%* | *4.03%* | *4.32%* |
| International Stocks | Long-Term Treasury Bonds | High Yield Corp Bonds | Long-Term Corp Bonds | Long-Term Corp Bonds | Long-Term Corp Bonds |
| *6.24%* | *7.01%* | *6.80%* | *6.42%* | *2.13%* | *3.88%* |
| Interm-Term Corp Bonds | International Stocks | International Stocks | Long-Term Treasury Bonds | Interm-Term Corp Bonds | Interm-Term Corp Bonds |
| *4.84%* | *5.32%* | *5.19%* | *4.51%* | *1.75%* | *2.46%* |
| Long-Term Treasury Bonds | Interm-Term Corp Bonds | Interm-Term Corp Bonds | Interm-Term Corp Bonds | Ultra Short-Term Bonds | Long-Term Treasury Bonds |
| *4.09%* | *4.25%* | *4.18%* | *3.53%* | *0.91%* | *2.28%* |
| Short-Term Bonds | Short-Term Bonds | Short-Term Bonds | Short-Term Bonds | Short-Term Bonds | Ultra Short-Term Bonds |
| *1.52%* | *1.52%* | *1.60%* | *1.39%* | *0.88%* | *1.40%* |
| Ultra Short-Term Bonds | Ultra Short-Term Bonds | Ultra Short-Term Bonds | Ultra Short-Term Bonds | Cash Equivalents | Short-Term Bonds |
| *0.54%* | *0.74%* | *0.81%* | *0.79%* | *0.76%* | *1.27%* |
| Cash Equivalents | Cash Equivalents | Cash Equivalents | Cash Equivalents | Long-Term Treasury Bonds | Cash Equivalents |
| *0.37%* | *0.58%* | *0.64%* | *0.63%* | *0.60%* | *1.25%* |

[9] Asset classes are represented by the following indices: Large Cap Stocks—S&P 500; Mid Cap Stocks—S&P MidCap 400; Small Cap Stocks—Russell 2000; High Yield Corp Bonds—Bbg US Corp High Yield; International Stocks—MSCI World Ex US; Long-Term Corp Bonds—Bbg US Long Credit; Interm-Term Corp Bonds—Bbg US Interm Credit; Long-Term Treasury Bonds—Bbg US Long Treasury; Short-Term Bonds—Bbg US Gov/Credit 1-3Y; Ultra Short-Term Bonds—ICE BofA US 6M Trsy Bill; Cash Equivalents—ICE BofA US 3M Trsy Bill.

*Defendants' Investment of Plan Assets*

57.    As Illustration B, below, demonstrates, Defendants have allocated Plan assets heavily to cash equivalents and other fixed income investments with durations of less than three years. These assets generate the lowest long-term average annual returns (*see* Illustration A).[10]

**Illustration B: Plan Asset Allocation, 2018–2023[11]**

|  | 2023 (est.) | 2022 | 2021 | 2020 | 2019 | 2018 |
|---|---|---|---|---|---|---|
| **CASH AND BONDS UNDER 3 YEARS** | 86% | 87% | 32% | 59% | 40% | 42% |
| **BONDS OVER 3 YEARS** | 6% | 6% | 6% | 11% | 20% | 28% |
| **STOCKS (OTHER THAN IBC)** | 0% | 0% | 57% | 24% | 33% | 24% |
| **IBC STOCK** | 8% | 7% | 6% | 6% | 7% | 6% |
| **TOTAL** | 100% | 100% | 100% | 100% | 100% | 100% |

58.    The average share of Plan assets allocated to cash equivalents and other fixed interest investments with durations of less than three years during the period 2018–2023 was around 58%.

59.    Defendants have not adhered to target asset allocation ranges. Defendants sold the Plan's entire stock portfolio (other than IBC Holdco stock) in 2022 during a period of temporary market decline, resulting in the entire Plan (other than IBC Holdco stock) being invested in cash equivalents and bonds at year-end 2022 and throughout 2023.[12]

---

[10] Cash equivalents include savings accounts, money market accounts, and certificates of deposit. Bonds under three years include other fixed-interest investments, such as treasury bonds, that would be classified as ultra short-term bonds or short-term bonds for purposes of Illustration A based on their durations and return characteristics.

[11] As of the date of this pleading, the Plan has not filed its 2023 annual report with the Department of Labor. The Plan's 2023 holdings are taken from IBC's Report of Condition and Income, which reports the Plan's asset allocation (as a fiduciary account of IBC) but with less detail concerning specific holdings than do the Plan's annual reports to the Department of Labor. Specifically, IBC's Report of Condition and Income states that the Plan held $88,634,000 in bonds, but does not provide the duration of those bonds. For purposes of Illustration B, Plaintiff has estimated that the Plan's proportion of short-term to longer-term bonds in 2023 was the same as it was in 2022.

[12] Stocks rebounded in 2023. For example, the S&P 500 was down 18.11% in 2022, up 26.29% in 2023, and is up 15.29% year-to-date in 2024 (through June 2024).

60.     While varying widely between 0% and 57%, the Plan's average allocation to stocks (other than IBC stock) during the 2018-2023 period was around 23%. Including IBC stock, the average allocation to stocks was around 29%.

61.     Defendants also have invested the Plan's assets heavily in IBC Banks products, including savings accounts, money market accounts, and certificates of deposit. For example, at year-end 2020, the Plan held 36% of its asset base in IBC Banks products that paid the Plan a weighted average interest rate of 0.23%. At year-end 2021, the Plan held 29% of its asset base IBC Banks products that paid the Plan a weighted average interest rate of 0.18%.

62.     Defendants' investments on behalf of the Plan included deposits with all five IBC Banks, despite all of these accounts generally paying the same rates. For example, the Plan's 2020 asset listing (Illustration C, below) shows deposits with all five IBC Banks (Laredo (IBC), Commerce, Zapata, Brownsville, and Oklahoma), all paying 0.10%–0.30%.

*Illustration C: Copy of Plan's Form 5500 Asset Listing, Certificates of Deposit, 2020*

| Certificates of Deposit | | |
|---|---|---|
| * International Bank of Commerce | Certificates of deposit bearing interest at 0.30% at December 31, 2020, maturing April 2021 | |
| IBC Brownsville CD#2111158089 | 7,000,000 | 7,000,000 |
| IBC Zapata CD#2111158100 | 7,000,000 | 7,000,000 |
| IBC CD#632296440 | 3,659,897 | 3,659,897 |
| Commerce Bank CD#2111158119 | 3,000,000 | 3,000,000 |
| IBC CD#635876440 | 2,843,806 | 2,843,806 |
| Certificates of deposit bearing interest at 0.10% at December 31, 2020, maturing January 2021 | | |
| IBC Oklahoma CD#2115706420 | 7,000,000 | 7,000,000 |
| Commerce Bank CD#2115148010 | 4,000,000 | 4,000,000 |
| Total certificates of deposit | 34,503,703 | 34,503,703 |

63.     While these proprietary cash investments offered no growth and *de minimis* income to the Plan, IBC Banks and IBC Holdco profited. IBC Banks use the Plan's deposits to

fund loans to customers at higher rates or to invest in higher yield products, keeping the difference and passing the profits to IBC Holdco in the form of dividends.

64.    IBC Banks collected net interest yields (the difference between interest received on loans and investments and interest paid to customers) of between 2.74% and 4.78% from 2018 to 2023. Net interest yields drive the majority of profits that IBC Banks pass on to IBC Holdco. Based on IBC Holdco's annual reports, it can be estimated that net interest yields generated annualized after-tax profits for IBC Holdco equal to around 1.12% to 2.77% of the amounts deposited.[13]

65.    Notably, the Plan's deposits with IBC Banks were the highest during IBC Banks' least profitable years. IBC Banks' net interest yields declined in 2020 and remained low until mid-2022. Defendants multiplied the Plan's deposits with IBC Banks during this sag in company profits, reaching as high as $56 million in mid-2020 after ending 2019 with $11 million.

66.    A complete accounting of net interest yields and profits received by Defendants from the Plan's deposits is not possible without a complete record of Plan transactions, which is not publicly available. Defendants moved the Plan's funds frequently among IBC Banks accounts, and the Plan's annual reports do not provide the dates of all transactions (among other things) necessary to determine the amount and duration of Plan deposits with IBC Banks at all times during the relevant period.

67.    Based on information available at this stage, Plaintiff estimates that IBC Banks collected at least $3 million in net interest yields from the Plan's deposits since 2018, generating at least $1 million in after-tax profits for IBC Holdco.

---

[13] This methodology assumes that net interest income and income from other sources contributed *pro rata* to reported after-tax profits—in other words, that non-interest expenses are allocated *pro rata* to interest income and other income.

### *Conduct of Fiduciaries of Similar Plans*

68.     No other defined contribution plan in the country has hired IBC to manage its investment strategy or asset allocation.

69.     No other defined contribution plan in the country invests in any IBC Banks product.

70.     Defined contribution plans invest around 60%–70% of their assets in stocks. *See e.g.*, Alicia H. Munnell, Jean-Pierre Aubry & Caroline V. Crawford, *Investment Returns: Defined Benefit vs. Defined Contribution Plans*, CENTER FOR RETIREMENT RESEARCH AT BOSTON COLLEGE, Issue in Brief No. 15–21, 3-4 (Dec. 2015).[14]

71.     Stock market upswings and downswings do not have a significant effect on how defined contribution plan fiduciaries allocate assets to stocks. As demonstrated in Illustration D, below, the percentage of 401(k) plan assets allocated to stocks has remained relatively stable despite wide fluctuations in the stock market year-to-year.[15] [16]

***Illustration D: Allocation to Stocks by 401(k) Plans & Stock Market Performance, 2005-2022***

| | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **STOCK ALLOCATION** | 68% | 68% | 68% | 56% | 60% | 62% | 61% | 61% | 66% | 66% | 66% | 67% | 64% | 63% | 70% | 69% | 69% | 71% |
| **STOCK MARKET** | +6% | +16% | +6% | -37% | +29% | +17% | +1% | +16 | +34% | +13% | 0% | +13% | +21% | -5% | +31% | +21% | +26% | -20% |

72.     Defined contribution plans invest most of their non-stock assets—around 20%–30% of total plan assets—in fixed-income investments. *See* Sarah Holden, Jack VanDerhei &

---

[14] *Available at* https://crr.bc.edu/wp-content/uploads/2015/12/IB_15-211.pdf.

[15] Data is taken from annual reports of the Employee Benefit Plan Research Institute (EBRI) and Investment Company Institute (ICI), *available at* https://www.ebri.org/retirement/401(k)-database. Stock market performance is represented by the Vanguard Total Stock Market Index Fund, which tracks the overall U.S. stock market.

[16] The change in plan assets allocated to stocks year-to-year is affected by both the change in value of stocks relative to other assets (*i.e.*, if stock values increase or decrease more than other assets, the stock allocation percentage increases or decreases) and inflows and outflows (*i.e.*, plans adding funds to or withdrawing funds from their stock investments, whether to "rebalance" the portfolio to target allocations or to change their desired allocations). While the cause of observed changes in stock allocation year to year cannot be precisely attributed to changes in desired equity allocation versus other factors, the notion that plans dramatically change their equity allocations in response to short-term stock market declines is definitively ruled out by the data.

Steven Bass, *401(k) Plan Asset Allocation, Account Balances, and Loan Activity in 2018*, EMPLOYEE BENEFIT RESEARCH INSTITUTE, Issue Brief No. 526, 2, 19 (Mar. 4, 2021).[17] No more than half of this amount (around 10%–15% of total assets) is represented by cash equivalents and other fixed investments with durations of less than three years.[18] The other half is represented by longer-term bonds and high yield-bonds.

73.    The overall asset allocation of the typical defined contribution plan based on the foregoing is:

- Stocks: around 60%–70%

- Cash equivalents and bonds less than three years: around 10%–15%

- Longer-term bonds and high yield bonds: around 10⁻15%

- Other: around 0%–10%

74.    While these are averages, the long-term returns of the entire universe of defined contribution plans show that there is limited variation. Asset allocation drives plan returns, and plan asset allocations are generally stable. Accordingly, distribution of long-term returns is revealing of the distribution of asset allocation strategies. *See* Ibbotson at 28, 32 (finding that 99% of a pension plan's total return level over time is explained by its asset allocation policy, which plans "tend to stick to"); *see also supra* Paragraphs 46-48 & Illus. A.

---

[17] *Available at* https://www.ebri.org/docs/default-source/pbriefs/ebri_ib_526_401kxsec.4mar21.pdf?sfvrsn=80823a2f_6.

[18] EBRI (*supra* note 17) found that around 31% of the fixed income allocation is attributed to money market funds and insurance contracts ((2.4% + 6.3%) / 28% = 31%). *Id.* at 1, 19. Concerning the remainder, most defined contribution plans pursue "core" fixed income strategies based on the Bloomberg U.S. Aggregate Bond Index, which is around 20% short-term. *See* Capital Group, "Rethinking fixed income in DC plans," (July 3, 2024), *available at* https://www.capitalgroup.com/institutional/insights/retirement/fixed-income-in-401k.html (finding that "fixed income options in DC plans are dominated by core fixed income, which is most often benchmarked to the Bloomberg U.S. Aggregate Index."). Accordingly, around 20% of the remaining 19.3% (3.86% overall) is estimated to be allocated to short-term fixed investments, and the total share of fixed income allocated to cash and other short-term securities is less than half ((2.4% + 6.3% + 3.86%) / 28% = 45%). This methodology likely overstates the cash and short-term allocation because it discounts investments in fixed income securities not captured by the Bloomberg U.S. Aggregate Index, such as high yield bonds and bonds with durations over 10 years.

75.    Illustration E, below, compares the distribution and mean of long-term average annual returns of more than 20,000 defined contribution plans to the distribution and mean of individual asset class returns and the Plan's returns over the same periods.[19]

76.    The results demonstrate that defined contribution plan returns are far more narrowly distributed than asset class returns (standard deviations of 1.29%–1.56% versus 4.19%–5.32%). This implies that plan portfolios are allocated among asset classes in similar ways.

77.    The results further demonstrate that the Plan's asset allocation strategy is an outlier. The Plan's portfolio generated long-term returns that were more than 2 standard deviations from the average plan's returns over 5 of 6 periods examined.[20] This implies that more than 95% of plans are closer to the average asset allocation.

*Illustration E: DC Plan Returns vs. Asset Class Returns and the Plan's Returns, 2009–2022[21]*

| | 2009-2022 Avg. Ann. Return | 2022 10-Year Avg. Ann. Return | 2021 10-Year Avg. Ann. Return | 2020 10-Year Avg. Ann. Return | 2019 10-Year Avg. Ann. Return | 2018 10-Year Avg. Ann. Return |
|---|---|---|---|---|---|---|
| DC Plans - Mean | 8.01% | 6.94% | 10.04% | 8.44% | 8.14% | 8.27% |
| DC Plans - Standard Deviation | 1.31% | 1.30% | 1.56% | 1.39% | 1.29% | 1.49% |
| DC Plans - 2 Standard Deviations | 2.63% | 2.61% | 3.12% | 2.78% | 2.58% | 2.97% |
| Major Asset Classes - Mean | 6.04% | 4.36% | 6.90% | 6.53% | 6.65% | 6.81% |
| Major Asset Classes - Standard Deviation | 4.59% | 4.19% | 5.32% | 4.31% | 4.47% | 4.79% |
| Major Asset Classes - 2 Standard Deviations | 9.18% | 8.38% | 10.64% | 8.62% | 8.94% | 9.58% |
| IBC Plan | 4.98% | 4.74% | 6.13% | 4.73% | 4.39% | 4.41% |
| IBC Plan - Distance from Mean | -3.03% | -2.20% | -3.91% | -3.71% | -3.75% | -3.85% |
| IBC Plan - Standard Deviations from DC Plans Mean | 2.31 | 1.69 | 2.51 | 2.67 | 2.91 | 2.58 |

---

[19] This analysis includes all private sector (*i.e.*, ERISA-covered) defined contribution plans that filed an asset and income statement (Schedule H to Form 5500) in each year 2009–2022 and maintained a constant employer identification number and plan number (such that the asset and income data from different years could be properly associated with the same plan). There are 24,348 plans that satisfied these criteria. A small portion of them (548 plans) that invested more than half their assets in stock of the sponsor company were then removed from the dataset because plans that invest primarily in the employer's stock are expected to generate returns that diverge from plans pursuing broader market strategies. After eliminating those plans, the dataset was comprised of 23,800 plans.

[20] The period ending in 2022 in which the Plan's average return was 1.69 standard deviations below the mean is discussed further in Paragraphs 88-89, *infra*.

[21] This analysis starts in 2009 because the source data is more complete starting with 2009 and ends in 2022 because 2022 is the last year for which most plans have filed reports. This range was not selected to be self-serving. Indeed, the full period ends at the lowest point for stocks in the period (*see* Illus. D), and the analysis presents 10-year measurements from each possible end point in the range.

78.     Illustration E also underscores that asset class weightings have predictable results for participants in defined contribution plans. The average plan is weighted toward assets that generate the highest long-term returns. The average plan beats the average return of the major asset classes, weighted equally. Defendants weighted the Plan's portfolio toward assets that generate the lowest long-term returns. The Plan regularly trails the average return of the major asset classes.

### *Inferences Regarding Defendants' Process*

79.     Based on the foregoing, it is reasonable to infer—and Plaintiff therefore alleges— that Defendants failed to engage in a prudent and loyal process to implement an appropriate investment strategy for the Plan.

80.     Among other things, Defendants failed to consider participants' needs, time horizons, and risk tolerance. Defendants managed the Plan to avoid short-term risks at the expense of participants' future retirement income. Defendants avoided risks that participants can tolerate and invited risks that they cannot. Defendants had the opportunity to implement a prudent asset allocation strategy similar to the typical DC plan yet failed to do so.[22]

81.     Defendants also made investment decisions on behalf of the Plan to serve their own interests. Defendants' outlier investment strategy is not based on any unique circumstances

---

[22] The broad universe of DC plans—notwithstanding that many plans allow participants to direct their accounts—is suitable for comparison to the Plan because Plan participants, like the typical DC plan participant, lack other retirement benefits and need long-term capital appreciation as their primary goal. Further, fiduciary judgment affects asset allocations and returns in participant-directed plans because fiduciaries select pre-mixed asset allocation funds as default investment options and provide advice services related to proper allocation strategies. *See* 29 C.F.R. § 2550.404c-5. Limiting comparator plans to fiduciary-directed plans would be inappropriate because 29% of the plans in the fiduciary-directed subset are union plans compared to only 2% in the broader DC plan universe. Union members tend to have multiple retirement benefits including a defined benefit plan. *See* Bureau of Labor Statistics, "The Economics Daily" (Oct. 25, 2019) ("Defined benefit plans are available to 79 percent of union workers and 17 percent of nonunion workers."), *available at* https://www.bls.gov/opub/ted/2019/union-workers-more-likely-than-nonunion-workers-to-have-retirement-benefits-in-2019.htm. Their higher level of retirement security changes their investment priorities and resulting asset allocation. Regardless, the Plan also generates far lower long-term returns than the average fiduciary-directed DC plan. The average fiduciary-directed plan earned 7.12% per year between 2009 and 2022 (compared to 8.01% for the broad DC plan universe), whereas the Plan earned only 4.98%.

of Plan participants. Nor is it based on any reasoned, albeit contrarian, belief concerning how best to serve participants' interests. Instead, Defendants' investment strategy is driven by their institutional biases and favor given to the company at the expense of Plan participants.

82.    Among other things, IBC Holdco entrusted the Plan's asset allocation strategy to IBC and IBC Holdco's board members despite their lack of experience managing DC plans. IBC Holdco and the PSP Committee failed to consider the appointment of a qualified independent fiduciary or investment consultant to manage the Plan's asset allocation function. In a substantial departure from prudent fiduciary practices, Defendants also managed the Plan based on their heightened sensitivity to short-term risks, by taking actions such as tripling the Plan's allocation to stocks in one year then selling *all* the Plan's stocks the next year. Finally, Defendants increased Plan deposits at IBC Banks and spread them throughout the company during a decline in the company's profitability to serve company interests, when no other DC plan invested in any IBC Banks product.

### Losses to the Plan and Participants

83.    The Plan has suffered and will continue to suffer large losses due to Defendants' failure to adopt and adhere to a prudent investment strategy. The Plan's losses are measured by the total return generated by Defendants' investments compared to the total return that would have been generated had Defendants engaged in a prudent and loyal process.

84.    A prudent and loyal process focused on Plan participants' interests alone would have caused the Plan to be invested in a portfolio that follows a long-term capital appreciation strategy, consistent with the typical DC plan.

85.    The Plan is worth around $20 million less than it would be had Defendants adopted a prudent strategy at the start of the six-year statutory period. The Plan's deficit will

grow until Defendants make good the losses to the Plan and adopt a prudent investment strategy (or appoint an independent fiduciary to discharge the Plan's asset allocation functions).

86.     There is no doubt that the Plan's losses are caused by Defendants' imprudent and self-serving asset allocation decisions. The Plan's estimated current loss of around $20 million is not dependent on manager selection, active versus passive management, or fees (within the range of fees found in the market for DC plans with around $100 million in assets). Nor is it dependent on any specific formulation of the prudent portfolio. Illustration F, below, presents a sample of prudent portfolios and calculates how each would have performed compared to Defendants' investments during the statutory period.

*Illustration F: Performance of Prudent Portfolios vs. the Plan Since August 2018*

| | Typical Plan Allocation– Passive[23] | Typical Plan Allocation– Active[24] | Single Balanced Fund[25] | Conservative Allocation[26] |
|---|---|---|---|---|
| **Earnings +/- Plan[27]** | +$19,883,119 | +$23,034,220 | +$21,355,127 | +$17,235,305 |

---

[23] This portfolio represents the average DC plan asset allocation through a mix of index funds (except that the guaranteed insurance contract or "stable value" allocation is represented by a peer index minus estimated management fees). The portfolio composition is: Vanguard Total Stock Market Index Fund: 68%; Vanguard Total Bond Market Index Fund: 23%; Morningstar US CIT Stable Value Index - 20 bps: 7%; Vanguard Federal Money Market Fund: 2%.

[24] This portfolio is the same as the Typical Allocation – Passive portfolio except that it substitutes actively managed funds ranked in the bottom half of their respective classes for the stock and bond allocations. The substitute funds used are Fidelity Stock Selector All Cap Fund and SEI Core Fixed Income Fund (SIMT). It is not prudent to retain underperforming or excessively priced funds; this illustration shows only that prudent asset allocation consistent with the typical DC plan would have outearned Defendants' portfolio by around $20 million or more with a range of managers, not necessarily the best or cheapest.

[25] This portfolio is based a single balanced fund that pursues a long-term capital appreciation strategy, the Vanguard Wellington Fund. This fund is actively managed and targets 60%–70% stocks and 30%–40% bonds, with flexibility within those ranges, and is thus similar to the typical DC plan portfolio but without participant choice as a possible factor. The fund is also commonly offered as an "all in" retirement portfolio option in DC plans.

[26] This portfolio represents a conservative variation on the typical DC plan allocation, reducing stocks to 60% and balancing it with 40% capital preservation. The portfolio composition is Vanguard Total Stock Market Index Fund: 60%; Morningstar US CIT Stable Value Index - 20 bps: 40%. The capital preservation component is represented by stable value rather than money market because stable value generally pays higher rates over time (although during the subject period it did not make a meaningful difference, on average). A prudent fiduciary pursuing this strategy would also likely consider an insurance contract directly issued by a single insurer, which typically pays even higher rates than the funds in the peer group that was modeled, while providing the same principal guarantee.

87.    Liquidation of the Plan's stock portfolio and retreat to short-term treasuries and cash in 2022 increased, rather than mitigated, the Plan's losses.

88.    Defendants' asset shift in 2022 narrowed the gap in 10-year average annual returns between the Plan and the average DC plan (*see* Illustration E, *supra*), but this was a pyrrhic victory. Despite avoiding 2022 market declines in part (Defendants did not avoid a loss entirely in 2022), the Plan remained 2.2% per year behind the average plan over 10 years. The Plan also remained behind each prudent portfolio described in Illustration F over the statutory period. Then stocks rebounded in 2023 while Defendants remained invested in treasuries and cash. Plaintiff estimates that, had Defendants held the Plan's portfolio at year-end 2021 through the present, the Plan would have earned a cumulative return of around 18% since the start of 2022. Instead, Plaintiff estimates that the Plan earned a cumulative return of less than 2%.[28]

89.    Holding onto the Plan's stock portfolio in 2022 would have left a smaller gap between the Plan's earnings and the earnings of a prudent portfolio. Liquidating the Plan's stocks greatly increased the Plan's deficit. This result was entirely foreseeable. It was not good luck for the typical DC plan to have held onto stocks in 2022 and bad luck for the Plan to have liquidated its stocks. The difference in actions and outcomes is driven by prudent risk management/professional investment management versus imprudent risk management/unprofessional investment management. The typical plan was focused on long-term

---

[27] For periods for which the Plan's investment earnings are not known (August to December 2018 and January 2023 to date), these calculations estimate the Plan's earnings using investable benchmarks that are consistent with the Plan's known asset allocation during that time (for 2023) or during the immediately preceding period (for August-December 2018 and the first half of 2024). Assumed total return percentages for the Plan for periods estimated using this method are as follows: last 5 months 2018: -3.30%; 2023: 6.92%; 1st half 2024: 2.86%. For 2019-2022, these calculations used the Plan's reported earnings.

[28] Investment earnings estimates for the Plan in this calculation are as follows: 2022: -8.63%; 2023: 6.92%; 1st half 2024: 2.86%. Hypothetical investment earnings estimates for the Plan's portfolio as of year-end 2021, if maintained thereafter, are as follows: 2022: -10.01%; 2023: 18.29%; 1st half 2024: 9.94%.

risks and investment goals rather than short-term risks, while Defendants reacted imprudently to short-term volatility.

90.     The Plan's losses harm individual participants through lower account values and distributions. Participants who have left the Plan, including Plaintiff, suffered harm when their distributions were lower than they would have been had Defendants managed the Plan prudently. For example, as of year-end 2021, the Plan was worth around $10–$15 million less than it would have been had Defendants invested in a prudent portfolio at the start of the statutory period. Participants who received distributions of their *pro rata* share of the Plan at the end of 2021 would have received higher distributions but for Defendants' imprudence. If Defendants are ordered to make good the losses to the Plan, Plaintiff and other former participants will be entitled to additional distributions from the Plan.

91.     Participants who remain in the Plan suffer harm because their current account values are lower than they would be had Defendants managed the Plan prudently. Current participants' account values will be higher if Defendants are ordered to make good the losses to the Plan. Current participants will be entitled to receive an allocation of the recovery, which will benefit them by increasing their future investing earnings and distributions.

## PLAINTIFF'S LACK OF ACTUAL KNOWLEDGE

92.     Until shortly before filing this action, Plaintiff lacked knowledge of material information necessary to support his claims. Among other things, he lacked knowledge of Plan investments holdings, and how the Plan compared to other defined contribution plans historically in its asset allocation and total return. Plaintiff also lacks actual knowledge of Defendants' process for determining the Plan's asset allocation along with selecting and monitoring Plan investments, and has no means to access such information until discovery commences. Plaintiff's

allegations are based on reasonable inferences drawn from the facts adduced to date and are made upon information and belief and in reliance on the investigation of counsel.

## PLAN-WIDE RELIEF

93.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks recovery on behalf of the Plan pursuant to this statutory provision.

94.     Plaintiff seeks recovery for injuries to the Plan sustained as a result of fiduciary breaches and seeks equitable relief on behalf of the Plan as a whole pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2)–(3).

95.     Plaintiff is adequate to bring this derivative action on behalf of the Plan, and his interest is aligned with other participants and beneficiaries. Plaintiff does not have any conflicts of interest with any participants or beneficiaries that would impair or impede his ability to pursue this action. Plaintiff has retained counsel experienced in ERISA litigation and intends to pursue this action vigorously on behalf of the Plan.

## CLASS ACTION ALLEGATIONS

96.     Plaintiff additionally and alternatively seeks certification of this action as a class action pursuant to Fed. R. Civ. P. 23.

97.     Plaintiff asserts his claims on behalf of a class of participants and beneficiaries of the Plan defined as follows:

> All participants and beneficiaries of the Plan since the date that is six years prior to the filing of this action, excluding fiduciaries of the Plan.

98.     Numerosity: The Class is so numerous that joinder of all Class members is impracticable. The Plan has consistently had more than 1,000 participants with account balances.

99.    <u>Typicality</u>: Plaintiff's claims are typical of the Class members' claims. Like other Class members, Plaintiff was a Plan participant and Plaintiff suffered injuries as a result of Defendant's violations of ERISA. Defendant treated Plaintiff consistently with other Class members with regard to the Plan. Defendant's improper actions affected all Plan participants similarly.

100.    <u>Adequacy</u>: Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are aligned with the Class that he seeks to represent, and he has retained counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does not have any conflicts of interest with any Class members that would impair or impede his ability to represent such Class members.

101.    <u>Commonality</u>: Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including, *inter alia*:

a.    Whether each Defendant was a fiduciary with respect to the Plan and the scope of each Defendant's fiduciary duties;

b.    Whether Defendants failed to comply with the ERISA fiduciary standards of prudence and loyalty in violation of 29 U.S.C. § 1104(a)(1);

c.    Whether Defendants acted for the benefit the company in violation of 29 U.S.C. §§ 1106(a)-(b);

d.    The proper form of equitable and injunctive relief; and

e.    The proper measure of monetary relief.

102.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying

adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

103.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court, such as disgorgement of proceeds of the prohibited transactions and allocation of the proceeds to participants, would be dispositive of the interests of all participants.

104.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of prosecuting claims of this nature. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' actions. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

105.    Plaintiff and his undersigned counsel will provide notice to the class to the extent required by Fed. R. Civ. P. 23(c)(2) and the Court.

## COUNT I

### 29 U.S.C. § 1104(a)(1)

106.     Plaintiff incorporates the foregoing paragraphs by reference.

107.     Defendants are Plan fiduciaries with discretion concerning how Plan assets are invested, or who manages them.

108.     Defendants violated ERISA fiduciary standards set forth in 29 U.S.C. § 1104(a)(1) by, *inter alia*, (1) failing to employ a prudent process for investing Plan assets in a manner consistent with the investment objectives of the Plan and its participants; (2) failing to monitor Plan investment performance and make necessary changes to promote long-term capital appreciation; and (3) allowing company biases and interests to influence their investment decisions.

109.     Defendants IBC Holdco and the PSP Committee also violated 29 U.S.C. § 1104(a)(1) by failing to monitor IBC's investment decisions and replace IBC based on its deficient performance. Instead, IBC Holdco and the PSP Committee sanctioned IBC's imprudent and disloyal investments.

110.     Defendants' violations of 29 U.S.C. § 1104(a)(1) caused the Plan injury in the form of lost investment earnings, and Defendants' deficient fiduciary conduct threatens future harm to the Plan of the same character. These injuries to the Plan adversely affected and continue to affect participants' accounts in the Plan.

111.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)–(3), Plaintiff, the Plan, and the Class are entitled to recover losses caused by Defendants' violation of 29 U.S.C. § 1104(a)(1), disgorgement of Defendants' profits, and other equitable and injunctive relief.

## COUNT II

### 29 U.S.C. § 1106(a)

112.    Plaintiff incorporates the foregoing paragraphs by reference.

113.    Defendants are Plan fiduciaries with discretion concerning how Plan assets are invested or who manages them.

114.    All IBC Banks are "parties in interest" to the Plan pursuant to 29 U.S.C. § 1002(14)(C) because their employees are Plan participants. IBC is a "party in interest" pursuant to 29 U.S.C. § 1002(14)(A) because it is a fiduciary of the Plan. IBC Holdco is a "party in interest" pursuant to 29 U.S.C. § 1002(14)(A) because it is a fiduciary of the Plan, and pursuant to 29 U.S.C. § 1002(14)(E) because it is the parent company of the employers of Plan participants.

115.    Defendants violated 29 U.S.C. § 1106(a) by transferring Plan assets to IBC Banks for the benefit of IBC Banks and IBC Holdco.

116.    Defendants' violations of 29 U.S.C. § 1106(a) caused the Plan injury in the form of lost investment earnings, and Defendants' deficient fiduciary conduct threatens future harm to the Plan of the same character. These injuries to the Plan adversely affected and continue to affect participants' accounts in the Plan.

117.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)–(3), Plaintiff, the Plan, and the Class are entitled to recover losses caused by Defendant's violation of 29 U.S.C. § 1106(a), disgorgement of Defendants' profits, and other equitable and injunctive relief.

## COUNT III

### 29 U.S.C. § 1106(b)

118.    Plaintiff incorporates the foregoing paragraphs by reference.

119.    Defendants are Plan fiduciaries with discretion concerning how Plan assets are invested or who manages them.

120.    Exercising the authority that makes each a fiduciary of the Plan, Defendants violated 29 U.S.C. § 1106(b)(1) by dealing with Plan assets in their own interests. Defendant IBC further violated 29 U.S.C. § 1106(b)(2) by representing both the Plan and IBC Banks in transactions in which the interests of the Plan and IBC Banks were adverse. Defendant IBC further violated 29 U.S.C. § 1106(b)(3) by receiving consideration for its holding and use of Plan deposits.

121.    Defendants' violations of 29 U.S.C. § 1106(b) caused the Plan injury in the form of lost investment earnings, and Defendants' deficient fiduciary conduct threatens future harm to the Plan of the same character. These injuries to the Plan adversely affected and continue to affect participants' accounts in the Plan.

122.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)–(3), Plaintiff, the Plan, and the Class are entitled to recover losses caused by Defendant's violation of 29 U.S.C. § 1106(b), disgorgement of Defendants' profits, and other equitable and injunctive relief.

## PRAYER FOR RELIEF

123.    Wherefore, Plaintiff prays for judgment against Defendants and for the following relief:

A.    Certify Plaintiff's authority to seek plan-wide relief on behalf of the Plan pursuant to 29 U.S.C. § 1132(a)(2);

B.    Alternatively, certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify Plaintiff as the class representative, and certify his counsel as class counsel;

C.    Order Defendants to make good to the Plan all losses resulting from their violations of ERISA;

D.    Impose equitable and injunctive relief sufficient to protect Plan

participants, including changes to Defendants' investment process, removal of the Plan's current fiduciaries, and/or appointment of independent fiduciaries, investment advisors, and managers;

E.    Impose a constructive trust or equitable lien on all profits received by IBC Banks or IBC Holdco that can be attributed to Defendants' investment of Plan assets in IBC Banks products;

F.    Award Plaintiff reasonable attorneys' fees and costs incurred pursuant to 29 U.S.C. § 1132(g), and/or pursuant to the common fund method;

G.    Award prejudgment and post-judgment interest; and

H.    Award such other and further relief as the Court deems just and equitable.

Respectfully Submitted,

Dated: August 14, 2024                    **LAW OFFICE OF OCTAVIO SALINAS II P.C.**

/s/Octavio Salinas II
Octavio Salinas II
Attorney-in-charge
TX Bar No. 17535800
S.D. Tex. ID No. 15655
1116 Calle Del Norte
Laredo, TX 78041
Telephone: (956) 727-4942
Facsimile: (956) 727-0792
osalinasii@att.net

**ENGSTROM LEE LLC**
Jennifer K. Lee, MN Bar No. 0399012*
Carl F. Engstrom, MN Bar No. 0396298*
323 N. Washington Ave., Suite 200
Minneapolis, MN 55401
Telephone: (612) 305-8349
Facsimile: (612) 677-3050
jlee@engstromlee.com
cengstrom@engstromlee.com

*pro hac vice* motion forthcoming

**ATTORNEYS FOR PLAINTIFF AND THE PROPOSED CLASS**